IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PHILLIP PATRICK BACA
MARY MOLINA MESCALL
RON ROMERO AND
BERNADETTE MIERA,

    Plaintiffs,

V.                                          Case No. 13CV0076 WJ/WPL

RICHARD J. BERRY,
IN HIS OFFICIAL CAPACITY AS
MAYOR OF ALBUQUERQUE

    Defendant.

### MEMORANDUM OPINION AND ORDERING GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR ATTORNEYS' FEES, EXPERT FEES AND COSTS

**THIS MATTER** comes before the Court upon Defendant's Motion for Attorneys' Fees, Expert Fees, and Costs, filed January 17, 2014 **(Doc. No. 37)**. Having considered the parties' briefs, the oral argument presented at the hearing conducted on May 12, 2014 and the applicable law, the Court finds that Defendant's motion is partially well-taken and, therefore, is GRANTED in part and DENIED in part.

### Background

Plaintiffs originally filed this lawsuit in the Second Judicial District Court, County of Bernalillo, State of New Mexico on January 17, 2013. The sole defendant in this case is Richard J. Berry in his official capacity as Mayor of Albuquerque ("Defendant"). The complaint sought injunctive and declaratory relief to achieve a constitutionally acceptable and otherwise lawful redistricting of the Albuquerque City Council. The case was brought pursuant to Art. VI §13 of

the New Mexico Constitution, the equal protection clauses of Art. II, §18, of the New Mexico Constitution, the Fourteenth Amendment to the United States Constitution, and Section 2 of the Voting Rights Act of 1965 (as amended), 42 U.S.C. §§ 1983 and 1988. Defendant properly removed the case to federal court on January 24, 2013, based on federal question jurisdiction.

Plaintiffs sought voluntary dismissal without prejudice under Rule 41(a) of the Federal Rules of Civil Procedure on July 5, 2013. Two weeks after Plaintiffs filed their motion, Defendant filed a motion to dismiss with prejudice. Plaintiffs' position was that their lawsuit may have been prematurely filed and Defendants' position, distilled to its essence, was that Plaintiff filed the complaint solely to draw media attention to alleged ethnic discrimination in the election process in the upcoming November elections in the City of Albuquerque.  On September 30, 2013, the Court entered a stay in this case and deferred ruling on both motions until after the conclusion of the mayoral race, at which point the parties would advise the Court whether, based on the results of the mayoral election, they still wished to pursue litigation on the allegations raised in the complaint. See (**Doc. No. 30**).  The Court ultimately dismissed this matter with prejudice.  See (**Doc. No. 35**).  After the final judgment was entered, Defendant moved for an award of attorneys' fees and costs.  Plaintiffs, not surprisingly, opposed the imposition of sanctions in the form of attorneys' fees.

As an initial matter, the Court notes for the record that Plaintiffs' response brief utterly failed to address the majority of Defendant's arguments advanced in support of the request for sanctions.  Defendant raised a number of different statutes and procedural rules as grounds for awarding attorneys' fees; however, Plaintiff ignored all of these arguments and instead focused solely on whether awarding Defendant, as the prevailing party, the $350 filing fee as an allowable cost was appropriate under Fed. R Civ. P. 54.  At the hearing on this matter, Plaintiffs

offered no explanation for their failure to address the issue of attorneys' fees.  Nonetheless, the Court allowed Plaintiffs to put on evidence and orally contest any award of attorneys' fees at the hearing.

By order entered May 28, 2014 **(Doc. No. 54),** the Court awarded Defendant, as the prevailing party, costs in the amount of $350 assessed against the individual Plaintiffs as requested by Defendant.  What remains at issue is Defendant's request for sanctions including attorneys' fees and other costs in the form of expert witness fees incurred by Defendant in defending this lawsuit.

Defendant originally moved for sanctions under a variety of different statutes and federal court rules, including 42 U.S.C. §1988, 42 U.S.C. §19731, 28 U.S.C. §1927, Fed. R. Civ. P. 16(f), and Fed. R. Civ. P. 37(d); however, the Court will only award sanctions under 28 U.S.C §1927.  Although the maintenance of this lawsuit likely meets the standards for other rules or statutes providing for sanctions, the Court will not rely on those in awarding sanctions, because awarding sanctions under these other rules and statutes would involve sanctioning the parties themselves, a result the Court does not find appropriate in this instance for the following reasons. First, the individual Plaintiffs were relying on the advice of counsel in continuing this litigation; second, the parties themselves are of modest means; and third, Defendant conceded at the hearing, and the Court finds, that this lawsuit was not filed in bad faith.  Therefore, the question for the Court is whether at some point during the course of the litigation did Plaintiffs' counsels' conduct in maintaining this case multiply the proceedings in an unreasonable and vexatious manner and if so, when did this occur?

**Discussion**

I.   **Attorneys' Fees**

    A.   *Legal Standard*

Under § 1927, "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct."  Section 1927 focuses on whether an attorney's conduct "imposes unreasonable and unwarranted burdens on the court and opposing parties."  <u>Braley v. Campbell,</u> 832 F.2d 1504, 1510 (10th Cir.1987) (en banc). "Sanctions under § 1927 are appropriate when an attorney acts recklessly or with indifference to the law. They may also be awarded when an attorney is cavalier or bent on misleading the court; intentionally acts without a plausible basis; [or] when the entire course of the proceedings was unwarranted."  <u>Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.,</u> 430 F.3d 1269, 1278 (10th Cir.2005) (alteration in original) (citation omitted) (internal quotation marks omitted).  An attorney is expected to exercise judgment.  See <u>Braley</u>, 832 F.2d at 1512. The Court will not "excuse objectively unreasonable conduct."  <u>Hamilton v. Boise Cascade Express,</u> 519 F.3d 1197, 1202 (10th Cir.2008); <u>see also</u> <u>Danielson-Holland v. Standley & Associates, LLC,</u> 512 F. App'x 850, 853 (10th Cir. 2013) ("If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." (citing <u>Riddle & Assocs., P.C. v. Kelly,</u> 414 F.3d 832, 835 (7th Cir.2005).  An attorney must "regularly re-evaluate the merits" of claims and "avoid prolonging meritless claims." <u>Steinert,</u> 440 F.3d at 1224.

    B. *Defendant is entitled to reasonable attorney's fees after the date that Mr. Sanderoff's report was provided to Plaintiffs*

Plaintiffs had a good faith basis for filing the complaint; however, there came a point in

4

the litigation when the case was no longer viable.  The Court finds that the "magic date" that this case was no longer viable and Plaintiffs' counsel unreasonably continued this matter was June 25, 2013, the date that Plaintiffs' counsel was provided with Mr. Brian Sanderoff's expert report.  Upon reading that report, it would have been clear to a reasonable attorney that this case no longer had merit.  However, Plaintiffs' counsel continued to pursue this case and it is this conduct on the part of Plaintiffs' counsel which conduct the Court finds to be objectively unreasonable.  Notably, Mr. Sanderoff's report came after Plaintiffs were aware of a change in the City charter that raised the percentage of the votes required to avoid a run-off from 40% to 50%; an event that Plaintiffs admit had an ameliorating effect on their concerns.  Thus, Plaintiffs' counsel had even more indication that the case was no longer viable.  The Court will not award attorneys' fees incurred prior to June 25, 2013.  The Court would have been inclined to grant leniency towards Plaintiffs' counsel if they had simply acquiesced to Defendant's request to dismiss this case with prejudice.  They did not, however, and instead continued the charade of proceeding forward with this matter, causing the tax payers of Albuquerque to expend additional resources for attorneys' fees in spite of the fact that Plaintiffs' counsel knew or should have known that this case was over.

      The landmark case for measuring voting rights case involving multi-member districts is Thornburg v. Gingles, 478 U.S. 30 (1986).  Under Gingles, there are three factors required to state a viable voting rights case: 1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district; 2) the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests."; and 3) "the minority must be able to

5

demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, to defeat the minority's preferred candidate." Id., 50-51. (citation omitted). Neither of Plaintiffs' experts ever purported to, let alone actually established, the Gingles factors in this case. One of Plaintiffs' expert, Lonna Atkeson, alluded to racially polarized voting, but her report did not contain a full analysis of whether this racially polarized voting was sufficient to meet the third prong of the Gingles test. Further, it was clear from Mr. Sanderoff's report that Plaintiffs could not establish the factors.

At the sanctions hearing, Plaintiffs' expert, George Korbel, brought up additional concerns with the redistricting plan that were not raised in his initial report. When questioned about this, Plaintiffs' counsel replied that experts always have the ability to supplement their reports and that it is not unusual for an expert report to be supplemented a number of times. This is not an acceptable response as far as the Court is concerned. At the time that Plaintiffs' expert submitted his report, months into this litigation, Plaintiffs' counsel either had an expert opinion to back the claims or they did not. Plaintiffs' counsel failed to move this matter forward in a timely manner and failed to fulfill their obligations to the Court. For example, the Court notes that Plaintiffs' counsel never provided an alternative map for city council districts. Moreover, Plaintiffs apparently failed to respond to discovery requests and did not provide Defendant with a copy of one of their expert's reports. The thrust of the lawsuit was that the new plan disadvantage minority voters. However, the new redistricting plan adopted by the City of Albuquerque in 2012 actually added a new majority minority district and kept the previous three (3) majority Hispanic districts and one majority minority district. Therefore, considering that the new plan has three majority Hispanic districts and two majority minority districts, this results in

a total of five majority minority districts out of nine districts overall; thus, the majority of the city council districts in the plan adopted are majority minority districts.  Plaintiffs were never able to show how the numbers were anything but what they appeared on their face to be, favorable to minority voters.

Plaintiffs' counsel's reliance on Larios v. Cox, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) aff'd, 542 U.S. 947, 124 S. Ct. 2806, 159 L. Ed. 2d 831 (2004) is misplaced for a number of reasons.  First, this issue was only raised when Plaintiffs were facing potential sanctions as an attempt to bolster their case after the fact, as Plaintiffs' expert did not address Larios is in his initial expert report.  Thus, the Court finds Plaintiffs attempt to claim a Lairos violation at this late stage disingenuous.  Second, there is clearly no Larios violation in this instance.  In Lairos, a three judge panel addressed the question of whether a redistricting plan that had variances in population between the districts was unconstitutional.  Id., at 1337.  The court noted that while districts should be of equal population, "deviations from exact population equality may be allowed in some instances in order to further legitimate state interests such as making districts compact and contiguous, respecting political subdivisions, maintaining the cores of prior districts, and avoiding incumbent pairings."  Id. Defendant pointed out that the population variance was due to the efforts by City of Albuquerque officials to mollify Albuquerque's west side population's request for districts that did not cross the Rio Grande River, a legitimate redistricting goal supported by nearly everyone and a goal that even one of the Plaintiffs himself acknowledged was a recurring theme during the public comment section of the redistricting process.  Thus, Plaintiffs' counsel knew that there was a legitimate reason for the variance between the population before the lawsuit was even filed, and Mr. Sanderoff's report further confirmed this reason. Additionally, while there is no "safe harbor" for a population variance, the

7

population variance in this case was within a range that is typically acceptable. See White v. Regester, 412 U.S. 755, 764 (1973) ("an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations); see also Larios, at 1341 (noting that the 10% deviation is not an automatic bar to constitutional attack and thus is not a "safe harbor").

The event perhaps most illustrative of Plaintiffs' counsel subjective knowledge regarding the merits of the case was their offer to dismiss the matter without prejudice. Plaintiffs' counsel offered various reasons for their offer to dismiss without prejudice; none of which were compelling. As noted in the Order dismissing the case with prejudice, given the amount of time the Court allowed Plaintiffs to attempt to decide whether or not they had a case, the Court found Plaintiffs' reasons to be "disingenuous." See **(Doc. No. 35)**. The timing of the motion to dismiss without prejudice belies counsel's insistence that their decision to dismiss the case was not influenced by Mr. Sanderoff's report. Plaintiffs moved for dismissal without prejudice roughly two weeks after Mr. Sanderoff's report was provided to them. Plaintiffs' counsel also attempts to shift the blame for unnecessarily prolonging this matter to Defendant by noting that they offered to dismiss the case without prejudice or dismiss the federal claims and allow this case to go back to state court but Defendant rejected these offers. The Court finds no fault with Defendant's refusal to accept either of these options because both would involve the continuation, or possible continuation, of a meritless case. To suggest that Defendant, in a redistricting case such as the one at bar, should agree to dismissal of properly removed federal claims only to have the state claims go back to be litigated in state court is absurd.

Plaintiffs' counsel repeatedly argued that the reason they could not decide whether the problems with the new plan ever existed or had been remedied by a change in the law was

because Defendant failed to provide the underlying population numbers.  However, the new redistricting plan was based upon United States Census data which is publically available information.  Further, this data could have been obtained through the formal discovery process, and although Plaintiffs claim Defendant ignored their discovery requests, no motion to compel was ever filed.  Had such a motion been filed, it would have been promptly handled by the Court.  Finally, Plaintiffs' expert, Lonna Atkeson, documented in her report an exchange between herself and Brian Sanderoff in which she was able to obtain additional data from Mr. Sanderoff by making a simple informal request.  Had Plaintiff's counsel simply asked for the data the Court is of the view that such data would have been provided but even if Defendant had not agreed to furnish the data, the Court is quite confident that Plaintiffs' counsel, as seasoned and experienced litigation attorneys in redistricting cases, would have been able to obtain publicly available census data.  Simply stated, Plaintiffs' counsel was unable to provide an explanation of why they made no real attempt to get the information they needed in order to proceed with this case.  To the Court this appears to be yet another excuse for Plaintiffs' counsels' clear disregard for the glaringly obvious fact that this case was without merit.

Plaintiffs' counsel also made the argument that this Court should not award sanctions because voting rights are so important that awarding sanctions might discourage other potential plaintiffs from filing lawsuits to enforce their voting rights.  The Court agrees with Plaintiffs' counsel that voting rights are paramount; they are far too important for governmental entities to be forced to waste time and resources litigating cases devoid of any merit.  Counsel must have the appropriate amount of respect for litigation involving such a fundamental right.  What the Court is most struck by is that after nearly a year of litigation, discovery, motions practice, Plaintiffs' counsel still does not have a valid explanation for why they continued pursuing this

case after the Sanderoff report and the change to the City charter clearly demonstrated that minority voters were not being harmed by the new redistricting plan. For the foregoing reasons, the Court orders Plaintiffs' counsel to pay Defendant's reasonable attorneys' fees incurred after June 25, 2013.

C.     *Amount of Attorneys' Fees*

Defendant submitted requests for attorneys' fees for work provided by Attorney Luis Stelzner, and members of his firm, and Attorney Pat Rogers along with accompanying affidavits. The Court has provided the requests below in table format.

| **Attorneys' Fees Requested for Work Completed after June 25, 2013**[1] | | | |
|---|---|---|---|
| Date | Description | Amount | Total for Month |
| June 2013 | Luis Stelzner<br>Pat Rogers | $509.50<br>$455.50 | $965.00 |
| July 2013 | Luis Stelzner<br>Pat Rogers | $1,236.94<br>$4,467.25 | $5,707.19 |
| August 2013 | Luis Stelzner<br>Pat Rogers | $5,676.35<br>$3,691.50 | $9,367.65 |
| September 2013 | Luis Stelzner<br>Pat Rogers | $157.29<br>$187.25 | $344.54 |
| October 2013 | Luis Stelzner<br>Pat Rogers | $1,872.50<br>$963.00 | $2,835.50 |
| November 2013 | Luis Stelzner<br>Pat Rogers | $695.50<br>$374.50 | $1,070.00 |
| December 2013 | Luis Stelzner<br>Pat Rogers | $749.00<br>$160.50 | $909.50 |
| **Total from June 25, 2013** | | **$21,199.38** | |
| **Motion for Attorneys' Fees** | | | |
| January 2014 | Luis Stelzner<br>Pat Rogers | $5,998.42<br>$1,177.00 | $7,175.42 |

---

[1] The Court did not include the requested fees on behalf of Mr. Sanderoff. The majority of Mr. Sanderoff's work was completed prior to June 25, 2013. Further, the Court does not find it equitable to include Mr. Sanderoff's fees as part of the sanctions award because Mr. Sanderoff's work is what demonstrated the lack of merit to Plaintiff's claims.

| | | | |
|---|---|---|---|
| February 2014 | Luis Stelzner<br>Pat Rogers | $5,344.65<br>$1,337.50 | $6,682.15 |
| March 2014 | Luis Stelzner<br>Pat Rogers | $1,963.45<br>$882.75 | $2,846.20 |
| April 2014 | Pat Rogers | $2,140.00 | $2,140.00 |
| May 2014 | Luis Stelzner | $8,174.80 | $8,174.80 |
| **Total for Motion for Attorneys' Fees** | $21,199.38 | | |
| **Total** | $48,217.95 | | |

Accordingly, for the time period the Court is considering, Defendant has requested $48,217.95 in attorneys' fees. After the hearing, the Court gave Plaintiffs an opportunity to challenge the amount and reasonableness of attorneys' fees requested, because earlier briefing had focused simply on whether Defendant was entitled to attorneys' fees rather than the reasonableness of the amount requested. In their Supplement, however, Plaintiffs largely focused again on the merits of whether Defendants are entitled to attorneys' fees. See (**Doc. No. 57**), Plaintiffs' Response to Defendant's Supplemental Authority in Support of Motion for Attorneys' Fees and Costs (arguing that there was no bad faith involved in this litigation and that Defendant was not the prevailing party). Plaintiffs generally argued that it was difficult to determine whether the fees' were justified because certain names had been redacted. The Court notes that the documentation supporting Defendant's request for attorneys' fees was redacted, but not to the point that the Court was unable to determine generally what each time entry was documenting. The Court finds that the amount of attorneys' fees requested is reasonable. Therefore, the Court awards Defendant $48,217.95 in attorneys' fees as a sanction against Plaintiffs' counsel for unreasonably continuing the litigation after it became apparent that the

case had no merit.

**THEREFORE, IT IS ORDERED**, that Defendant's Motion for Attorneys' Fees, Expert Fees, and Costs **(Doc. No. 37)** is **DENIED** in part and **GRANTED** in part.

**IT IS FURTHER ORDERED,** that Defendant is awarded sanctions against Plaintiffs' counsel in the amount of $48,217.95 pursuant to 28 U.S.C. §1927.

_____
UNITED STATES DISTRICT JUDGE